**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
CHARLOTTE **DIVISION**
**CIVIL ACTION NO.** 3:12-CV-00132-GCM

| | |
|---|---|
| MICHAEL MEAD**,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )       <u>ORDER</u> |
| | ) |
| CALVIN SHAW | ) |
| REGINALD BLOOM | ) |
| WILLIAM SAMPSON | ) |
| GASTON COUNTY**,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

       **THIS MATTER** is before the Court on Defendants' Partial Motion to Dismiss (Doc. No. 117) and Memorandum in Support (Doc. No. 119), Plaintiff's Response in Opposition (Doc. No. 131), and Defendants' Reply (Doc. No. 133), as well as Defendants' Motion for Summary Judgement (Doc. No. 141) and Memorandum in Support (Doc. No. 149), Plaintiff's Response in Opposition (Doc. No. 161), and Defendants' Reply (Doc. No. 170). Plaintiff's Partial Motion for Summary Judgment on Counts II and IV (Doc. No. 150) and Memorandum in Support (Doc. No. 152), Defendants' Response in Opposition (Doc. No. 167), and Plaintiff's Reply (Doc. No. 173) are also before the Court.

## I.     BACKGROUND

       This case arises out of the Gaston County Police Department's handling of the Lucy Dye Johnson murder investigation. On July 16, 2008, at around 3 am, emergency responders were called to the scene of a massive house fire at Johnson's residence. (Sampson Case Summary at 1, Doc. No. 154-21) When the fire had been put out, Johnson's body was located in an upstairs bedroom. It was determined that she had been shot twice in the back of the head with a .38 or

.40 caliber handgun. (Sampson Case Summary at 10, Doc. No. 154-21) Additionally, investigators noted the possibility of sexual assault because the victim was found with her underwear pulled down to her knees. At the time of her death, Lucy Johnson was three months pregnant and engaged to Plaintiff Michael Mead, who she had been dating for only a few weeks when she became pregnant. Johnson was alone in the house at the time of her murder, as her two children were each spending the night with their fathers, Phillip Okruhlica and James Spelock. (Plaintiff's Memorandum in Support at 3, Doc. No. 152)

Gaston County police officers investigated several suspects in connection to the Johnson murder, including Johnson's ex-husbands, Phillip Okruhlica and Jim Johnson, her ex-boyfriend, James Spelock, and Plaintiff. (Bloom Case Summary, Doc. No. 154-3) Because the crux of Plaintiff's complaint is that Defendants erred in arresting him for Johnson's murder when there was probable cause to arrest Spelock, the Court will focus on the evidence amassed against those two men.

## A. Investigation of Mead

Defendants cited to the deposition testimony of William Stetzer, the assistant district attorney who made the decision to indict Mead, in support of their argument that there was probable cause to prosecute him. (Defendants' Memorandum in support at 4, Doc. No. 149) They note that Stetzer listed several reasons that the investigation focused on Mead. (Stetzer Depo. at 30-32, Doc. No. 141-2)

First, investigators described Plaintiff's behavior as somewhat odd, first at the scene of the house fire and then later in interviews with police. For example, Detective Hensley's notes from the crime scene, apparently taken the same day, note that the only emotion he witnessed Mead display was anger and that he did not see Mead cry at any point. (Hensley Handwritten

Notes, Doc. No. 154-11)  Hensley further noted that Mead was angry about "the media" and their "interest in him," that he was observed pacing and hovering around investigators, and that he seemed particularly concerned about the fire.  (Hensley Handwritten Notes, Doc. No. 154-11)  There was also some evidence that Mead may have had non-public information about the crime scene.  Apparently, at the time when the only crime known to the public was arson, Mead approached some of Johnson's neighbors and asked if they had heard gunshots.  (Sampson Case Summary at 6, Doc. No. 154-21)  Additionally, at least one neighbor indicated that Plaintiff was walking around with his young son, and asked the son "We don't even own a gun, do we," in a manner that appeared rehearsed.[1]  (Sampson Case Summary at 6, Doc. No. 154-21)  Later, when Plaintiff was interviewed by investigators, both they and A.D.A. Stetzer, who reviewed the interview tapes, found his demeanor to be hostile.  (Stetzer Depo. at 34, Doc. No. 141-2; Bloom Case Summary at 18, Doc. No. 154-3)  As one detective recalled, Mead called two officers "white trailer trash" in an interview.  (Rhoney Depo. at 184, Doc. No. 153-11)

The investigators also gathered evidence about Mead's past relationships with other women and with the victim.  Stetzer recalled that the investigators told him Plaintiff had been involved in prior violent or difficult relationships with women, and that he had been dating the victim for a short period of time when she became pregnant.  Officers also told Stetzer that Plaintiff had previously been engaged, and that he had apparently told witnesses that two other women he had been engaged to had died.  (Stetzer Depo. at 30-32; Doc. No. 141-2)  Stetzer also recounted that there had been a conversation between the victim and her friend Deanna Bradshaw in which she stated that her engagement ring did not look legitimate.  (Stetzer Depo. at 31; Doc. No. 141-2)

---

[1] When investigators later searched Mead's home, they determined that he did in fact own a .45 caliber handgun that was registered to his brother and had been reported stolen.  (Bloom Case Summary at 20, Doc. No. 154-3)

Other evidence uncovered during the investigation seemed to suggest Mead's possible involvement in Johnson's murder.  First, he was the last person to speak with the victim before she died, and his lengthy telephone call with her during the night she was killed was longer than most of their previous calls.  (Shaw Depo. at 147, Doc. No. 141-8)  Next, he took two different polygraph exams and during each the administrator, Special Agent Bridges of the North Carolina State Bureau of Investigations, found his behavior suspicious.  (Bloom Case Summary at 8-9, Doc. No. 154-3; Rhoney Depo at 131, Doc. No. 153-11)  Special Agent Bridges informed investigators that, during the first exam, Mead repeatedly held his breath for periods of up to 15 seconds, even after being warned to stop.  (Bloom Case Summary at 8-9, Doc. No. 154-3) During the second exam, he breathed rapidly during the entire exam.  (Bloom Case Summary at 8-9, Doc. No. 154-3)  Special Agent Bridges advised that she viewed these behaviors as attempts to manipulate the exam results.  (Bloom Case Summary at 8-9, Doc. No. 154-3)  Additionally, investigators learned that the victim's engagement ring had gone missing from the crime scene. (Stetzer Depo. at 31, Doc. No 141-2)

Finally, Mead's DNA was found when law enforcement processed the victim's rape kit. Stetzer explained that the DNA evidence was the most powerful indicator of Mead's likely involvement in his view.  (Stetzer Depo. at 37-38, Doc. No 141-2)  In his experience, the presence of arson increased the significance of the DNA evidence, because the only reason to burn down the house under the circumstances would have been to destroy DNA evidence. (Stetzer Depo. at 32, Doc. No. 141-2)  The placement of Johnson's body also suggested that she may have been raped during her encounter with her assailant.  (Stetzer Depo. at 32, Doc. No. 141-2)  Additionally, law enforcement learned that the victim had recently had a surgical procedure that increased the risks associated with sexual intercourse during her pregnancy.

(Meeks Depo. at 61-62, Doc. No. 142-7; Shaw Depo at 191-92, Doc. No. 141-8)  In their filings, the parties dispute whether or not the victim categorically refused sexual intercourse after the procedure.  (*Compare* Defendants' Memorandum in Support at 10, Doc. No. 149; *with* Plaintiff's Response in Opposition at 17, Doc. No. 161).  However, Johnson's ex-husband Phillip Okruhlica told police—and later testified at trial—that Johnson had undergone the same procedure two months into her pregnancy with their daughter.  He further stated that the two had engaged in sexual intercourse on only one or two occasions in the next seven months before Johnson gave birth.  (Okruhlica Statement, Doc. No. 162-11; Okruhlica Testimony at 22, Doc. No. 163-6)

Additionally, the investigating officers determined that Plaintiff's proffered alibis were not conclusive.  (Defendants' Memorandum in Support at 4-5, Doc. No. 149)  First, Plaintiff's alarm system records showed that his alarm was armed at 12:17 am and disarmed at 7:36 am on the night of the murder.  (Shaw Depo. at 218, Doc. No. 141-8)  The investigating officers gave this alibi little weight for two reasons.  First, when they went to Mead's house to look at the system, he had had it replaced.  (Shaw Depo. at 219, Doc. No. 141- 8)  Second, the officers were told that the back door of the house was not hooked up to the alarm system so that Plaintiff could let his dog out at night without setting it off.  (Shaw Depo. at 218-19, Doc. No. 141-8)  The officers learned this from one of Plaintiff's ex-girlfriends or his ex-wife.  (Shaw Depo. at 220-21, Doc. No. 141-8)  As for Plaintiff's statement that his gaming system would reflect that he had been playing video games at the time of the murder, the officers determined that no other person could corroborate this claim and that the time stamps for the gaming system could have been manipulated.  (Shaw Depo. at 221-22, Doc. No. 141-8)

**B. Investigation of Spelock**

Taken in the light most favorable to Plaintiff, the police were aware of the following information about Spelock. First, Spelock and Johnson were involved in heated proceedings in family court over custody of their son. (Spelock v. Johnson Complaint, Doc. No. 154-27) She had discussed the possibility of obtaining a restraining order against him with a social worker employed by Charlotte-Mecklenburg County (Domestic Violence Healthcare Project Case Summary, Doc. No. 154-25), and she had complained to her lawyer and several others that she was afraid of him (Hodnett Trial Testimony, Doc. No. 153-25; Sampson Case Summary at 3-4, Doc. No. 154-21). Second, the victim had asserted to her lawyer and others that Spelock was interested in cross-dressing and had purchased some objects related to those interests. (Sampson Case Summary at 3, Doc. No. 154-21) Purchases made on Spelock's eBay account apparently corroborated those allegations. (Daniel Report at 3, Doc. No. 154-2; Spelock eBay Account Search Warrant, Doc. No. 154-29; Sampson Case Summary at 5-6, Doc. No. 154-21) Plaintiff suggests these allegations provided a motive for Spelock to harm the victim.

Third, there were reasons to doubt the validity of Spelock's alibi. Though he claimed to have been babysitting his infant son and conversing with a woman all night via text message, there was a gap of about one and a half hours in his text messaging conversation between 1:04 am and 3:35 am. (Rhoney Declaration at 3, Doc. No. 153-4; Bloom Case Summary at 10, 12, Doc. No. 154-3; Text Message Log at 3, Doc. No. 154-20) Additionally, while Spelock's roommate told police on two occasions that he did not hear Spelock leave during the night in his loud truck (Shaw Depo. at 196, Doc. No. 141- 8; Bloom Depo. at 89, Doc. No. 153-5), the roommate at some point ceased cooperating with the investigation, refusing to consent to a third police interview or take a polygraph exam. (Sampson Case Summary at 11, Doc. No. 154-21)

Fourth, the limited GPS data taken from Spelock's car indicated that at some point prior to the murder, he had entered the location of a dead end street separated from the victim's home by a section of a golf course—the implication being that Spelock could have parked at this street and walked to her house undetected by any neighbors. (Rhoney Declaration at 5, Doc. No. 153-4)

Lastly, analysis of Spelock's electronic devices raised some questions. First, a text message sent by Spelock shortly after the murder indicated that he may have had undisclosed information about the crime scene. Specifically, in response to a question about how he was doing Spelock said: "[N]ot looking good . . . they are really pointing the finger at me for some reason . . . . [I] think her boyfriend [M]ike or her [e]x husb[and] [J]im [J]ohnson had something to do with this . . . it may have just been a random person . . . . I wonder if they did a rape test on her . . ." (Rhoney Email at 5, Doc. No. 154-20 (ellipses in original)) At the time Spelock mentioned a rape kit, the police had not informed the public that the position of the victim's body suggested a possible sexual assault. Second, when investigators searched Spelock's home computer they found text fragments of various words that Plaintiff argues, when taken together, inculpate Spelock. (Bloom Cross Exam. at 52-53, Doc. No. 153-21) The State Bureau of Investigation collected 220 text fragments of possible interest from Spelock's computer, broken down as follows: (1) 30 text fragments reading "cars"; (2) 50 text fragments reading "child support," "babies," or "pregnant"; (3) 30 text fragments reading "home search"; (4) four text fragments reading "murder" or "guns"; (5) sixty four text fragments reading "searches"; and (6) 44 text fragments reading "transsexual."[2] (Bloom Cross Exam. at 52, Doc. No. 153-21)

---

[2] Plaintiff also states that Spelock's computer contained text fragments of the words "arson" and "kill," but his citations to the record do not support that finding.

### C. Mead's Trial and Acquittal

On January 9, 2012, at the direction of A.D.A. Stetzer (Stetzer Depo. at 210-11, Doc. No. 141-8) Defendant Bloom, the Detective in charge of the investigation at that point, signed an affidavit and application for an arrest warrant for Plaintiff. (Arrest Warrant, Doc. No. 142-12) The charges listed on the warrant application were First Degree Murder, Arson, and Burglary. (Arrest Warrant, Doc. No. 142-12) Three days later it was signed by a magistrate judge. (Arrest Warrant, Doc. No. 142-12) At this point, control over the case effectively transferred to the District Attorney's office, which proceeded to seek Grand Jury indictments. On January 20, 2009, the Grand Jury returned indictments for charges of First Degree Murder, First Degree Rape, Robbery with a Dangerous Weapon, First Degree Arson, and First Degree Burglary. (Grand Jury Indictments, Doc. No. 142-2) At trial, the judge dismissed most of the charges, but allowed the charges of First Degree Arson and First Degree Murder to go to the jury. (Trial Transcript at 21, Doc. No. 142-14) The jury acquitted Mead on both counts.

### D. Procedural History

Plaintiff Michael Mead filed suit in the District of South Carolina on November 4, 2011 alleging that Defendants violated his rights under state and federal law by arresting and prosecuting him for Johnson's murder. (Doc. No. 1) The case was transferred to this Court on February 28, 2012. (Doc. No. 44) Subsequently, Mead filed an amended complaint on May 18, 2012, alleging nine claims for relief: (1) unlawful seizure under the Fourth Amendment and 42 U.S.C. § 1983; (2) malicious prosecution under the Fourth Amendment and §1983; (3) substantive and procedural due process violations under the Fourteenth Amendment and § 1983; (4) trespass by public officers; (5) malicious prosecution; (6) substantive due process violations, brought in the alternative under the North Carolina Constitution, Art. I, §§ 1, 19; (7) false arrest

and false imprisonment, brought in the alternative under the North Carolina Constitution, Art. I, §§ 19, 20; (8) obstruction of justice; and (9) negligent infliction of emotional distress. (Doc. No. 59) The Court dismissed Plaintiff's obstruction of justice and negligent infliction of emotional distress claims, as well as his state constitutional claims (Counts VI, VII, VIII and IX). (Doc. No. 90).

On March 16, 2015, Defendants moved to dismiss Plaintiff's remaining state law claims, trespass by public officers and malicious prosecution. (Doc. No. 117) On September 14, 2015, Defendants moved for summary judgment as to all of Plaintiff's remaining federal claims: malicious prosecution and unlawful search and seizure in violation of the Fourth Amendment, and substantive and procedural due process violations. (Doc. No. 141) The next day, Plaintiff filed a partial motion for summary judgment on his state and federal claims for malicious prosecution. (Doc. No. 150). This matter is now ripe for disposition.

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The mere existence of a scintilla of evidence" in support of the non-movant's position is not sufficient to establish a genuine dispute. *Id.* at 252. A material fact affects the outcome of the suit under the applicable substantive law. *See id.* at 248. When determining whether a dispute is genuine or a fact is material, courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Unsupported speculation, however, is insufficient to defeat a motion

for summary judgment.  *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996).

III.    Discussion

**A.  Qualified Immunity—Federal Claims**

Defendants argue that they are entitled to qualified immunity on Mead's three federal claims, brought under 42 U.S.C. § 1983.  (Defendants' Memorandum in Support at 13, Doc. No. 149)  They assert that probable cause existed to arrest Mead, thus no defendant violated any right clearly established under the Fourth Amendment.  (*Id.* at 13-20)  They further argue that because Mead was not convicted and no defendant willfully withheld exculpatory evidence, Plaintiff has failed to establish that any of his clearly establish Fourteenth Amendment rights were violated. (*Id.* at 21-23)  Plaintiff disputes this characterization.  He argues that the named defendants did not have probable cause to arrest him, and he says that the record establishes both that they fabricated evidence relied on for a finding of probable cause and excluded exculpatory evidence from their investigation file.  (Plaintiff's Memorandum in Support at 18-26, Doc. No. 152; Plaintiff's Response in Opposition at 5-21, Doc. No. 161)  Accordingly, he argues that Defendants violated his clearly established constitutional rights and are not entitled to qualified immunity.

According to the Fourth Circuit, "[q]ualified immunity protects government officials from suit for damages when their conduct does not violate a 'clearly established' constitutional right."  *Evans*, 703 F.3d at 646 (citation omitted).  The purpose of the qualified immunity doctrine "is to allow some room for discretionary judgment in what are indisputably difficult circumstances and not to have the prospect of being blind-sided in hindsight discourage officers" from performing their duties.  *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 357 (4th Cir.

10

2010).  In order to avoid an immunity dismissal, "a plaintiff must (1) allege a violation of a right (2) that is clearly established at the time of the violation."  *Evans*, 703 F.3d at 646 (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  "If a plaintiff fails to allege that an official has violated any right, the official is hardly in need of any immunity and the analysis ends right then and there."  *Id.* (internal quotation marks and citation omitted).  In order to qualify for immunity, the defendant bears the burden of establishing "that his conduct was justified by an objectively reasonable belief that it was lawful."  *Gomez v. Toledo*, 446 U.S. 635, 641 (1980).

Plaintiff alleges claims for malicious prosecution, unlawful search and seizure, and substantive and procedural due process violations.  (Doc. No. 141)  For each claim, the Court must determine if a genuine dispute of material fact remains as to whether Defendants violated a clearly established right.  If the Court determines that Plaintiff's rights were violated, the question is whether Defendants have demonstrated that any reasonable officer would have believed their actions to be lawful under the circumstances.

### a.  Malicious prosecution and unlawful seizure

To state a claim for malicious prosecution under the Fourth Amendment, "a plaintiff must allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor."  *Evans*, 703 F.3d at 647.  Because the second element of this claim encompasses the totality of Plaintiff's unlawful seizure claim, the Court will evaluate both of Plaintiff's Fourth Amendment claims together.

To determine whether there was probable cause to arrest an individual, the Court looks to the totality of circumstances known to the arresting officers.  *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996).  If those facts and circumstances would suggest to a reasonable person that the

arrestee committed an offense, the arrest was supported by probable cause. *Id.* The arresting officers need not have evidence sufficient to support a conviction, but the facts and circumstances known to them must give rise to "more than a mere suspicion" that the arrestee committed a crime. *Id.*

Additionally, as the Fourth Circuit has explained, a plaintiff must also demonstrate but-for and proximate causation. *Evans*, 703 F.3d at 647. "[S]ubsequent acts of independent decision-makers (*e.g.,* prosecutors, grand juries, and judges) may constitute intervening superseding causes that break the causal chain between a defendant-officer's misconduct and a plaintiff's unlawful seizure." *Id.* Nevertheless, if officers have lied to or misled the prosecutor, failed to disclose exculpatory evidence to the prosecutor, or unduly pressured the prosecutor to seek the indictment, they may be liable despite the subsequent intervention of independent actors. *Id.* at 647-48. "Stated differently, a police officer is not liable for a plaintiff's unlawful seizure following indictment 'in the absence of evidence that [the officer] misled or pressured the prosecution.'" *Id.* at 648 (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)).

Here, Defendants assert that they are entitled to qualified immunity on Plaintiff's malicious prosecution and unlawful seizure claims for two reasons. First, they assert that there was probable cause to arrest him and, as a result, he has not established a genuine dispute of material fact as to one of the elements of the claim. (Defendants' Memorandum in Support at 17-20, Doc. No. 149) Second, they argue that, even if probable cause did not exist, subsequent findings of probable cause by the Grand Jury, prosecutor, and a state magistrate judge constitute intervening acts, such that Plaintiff cannot establish proximate cause. (Defendants' Memorandum in Support at 14-17) Plaintiff responds that there was no probable cause to arrest him (Plaintiff's Response in Opposition at 1-22, Doc. No. 161), and claims that because

Defendants withheld exculpatory evidence from the prosecutor, his decision to indict Plaintiff does not act as a superseding cause. (*Id.* at 22-24) Because Defendants are seeking summary judgment, the Court must first consider whether the facts, taken in the light most favorable to Plaintiff, establish that Defendants had probable cause to arrest and charge Plaintiff.

Plaintiff successfully raises a factual dispute about several pieces of evidence that Defendants assert support a finding of probable cause. For example, Plaintiff points out that the police never uncovered any evidence that that previous fiancées of his had died during their engagement. (Response in Opposition at 11, 14, Doc. No. 161; Stetzer Depo. at 176-77) Similarly, Defendants have not cited any evidence, beyond A.D.A. Stetzer's recollection, suggesting that the victim complained about her engagement ring. Finally, despite Defendants' assertions to the contrary, the fact that Plaintiff's case file contained a note, suggesting that the investigating officers knew that an EMS worker had taken the victim's engagement ring raises a material question about that piece of evidence. (Bloom Cross Exam., Doc. No. 163-5; Bloom Handwritten Note, Doc. No. 162-7) Although Defendants argue that this note came from a different file, the fact that the note itself has the name "Michael Mead" written on it seriously undermines that explanation.

However, other attempts to discredit evidence the police relied on are unavailing. For example, Plaintiff asserts that Detective Hensley's description of his demeanor at the crime scene was untruthful. (Plaintiff's Response in Opposition at 7, Doc. No. 161) However, the handwritten notes Detective Hensley took during the immediate aftermath of the crime are consistent with his later report. (*Compare* Case Supplement, Doc. No. 162-3; *with* Hensley Handwritten Notes, Doc. No. 154-11) Similarly, while Plaintiff asserts that the police had no evidence that he had been involved in past violent relationships with women, the record indicates

that Defendants accumulated reports from several women who described Plaintiff as verbally, or in some cases physically, abusive. (McAulay Case Summary at 16-17, Doc. No 144-20; Sampson Case Summary at 22, 24-25, Doc. No. 154-21).

With regard to other pieces of evidence on which Defendants relied, Plaintiff does not deny the evidence, but disputes its significance. Evidence in this category includes his demeanor in interviews, his comments to neighbors about gunshots, the presence of his DNA inside the victim, his lengthy phone call with the victim shortly before her murder, and the brief duration of his relationship with the victim prior to her pregnancy. (Plaintiff's Response in Opposition at 7-20, Doc. No. 161) Because the Plaintiff does not dispute that these facts were before the police at the time they made their decision to arrest him, the Court will not discount this evidence in determining whether they acted on probable cause. *See Wadkins v. Arnold*, 214 F.3d 535, 540 (4th Cir. 2000) ("Surrounding circumstances, even circumstances that appear innocent when considered alone, may provide a basis for a finding of probable cause." (alteration adopted)). When the Court evaluates law enforcement actions for the purposes of determining qualified immunity, "[w]hat matters is whether the officers acted reasonably upon the reports available to them and whether they undertook an objectively reasonable investigation with respect to that information." *Gooden v. Howard Cty.*, 954 F.2d 960, 965 (4th Cir. 1992). The Court finds that although Plaintiff may be correct, and Defendants may have come to the wrong conclusions about the facts before them, their inferences from those were not unreasonable. Thus, the Court will consider these facts in determining whether probable cause existed to arrest Plaintiff.

The Court finds that probable cause existed to arrest Plaintiff in light of the totality of the circumstances that the police considered. Even discounting the evidence for which Plaintiff has raised a genuine dispute of material fact about its authenticity, the police had substantial

evidence suggesting that Plaintiff was responsible for the victim's murder. Factors supporting a finding of probable cause included: (1) Plaintiff's demeanor at the scene; (2) his comments to neighbors about gunshots; (3) his demeanor during interviews with law enforcement; (4) his prior violent or difficult relationships with women; (5) the fact that he had been dating the victim for a short period of time and that she had quickly become pregnant; (6) the fact that he had previously been engaged; (7) his lengthy telephone call with the victim on the night she was killed; and (8) his attempts to manipulate a polygraph exam. Perhaps most powerfully, Mead's DNA was also found when law enforcement processed the victim's rape kit. The investigators reasonably found the DNA evidence to be particularly significant in light of the surrounding circumstances: her body had been found in a manner suggesting she may have been sexually assaulted immediately prior to her death, her house was burned to the ground for no apparent reason, and she had recently had surgery that increased the risks of engaging in intercourse during pregnancy.

Plaintiff also suggests that Defendants ought to have focused their investigation efforts on James Spelock, and that the body of evidence against Spelock rendered any decision to arrest and charge Plaintiff unreasonable. (Plaintiff's Response in Opposition at 20-21, Doc. No. 161; *see also* Plaintiff's Memorandum in Support at 5-17, Doc. No. 152) Plaintiff further claims that Defendants concealed evidence supporting Spelock's involvement in the crime from the prosecutor's office. (Plaintiff's Memorandum in Support at 22-24, Doc. No. 152; *see also* Reynolds Fax, Doc. No. 154-16) This argument merits the Court's consideration, because it is well settled that, although the failure to pursue potentially exculpatory leads is not sufficient to negate a finding of probable cause, law enforcement officers "may not disregard readily available exculpatory evidence of which [they are] aware." *Wadkins*, 214 F.3d at 541.

It appears to the Court that the totality of the evidence tending to inculpate Spelock in the murder does not undermine the determination of probable cause. "Reasonable law enforcement officers are not required to 'exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable cause is established.'" *Wadkins*, 214 F.3d at 541 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 264 (4th Cir. 1991)). Indeed, although Plaintiff quotes heavily from cases like *Clipper v. Takoma Park*, 876 F.2d 17 (4th Cir. 1989), the Court is unable to conclude that law enforcement officers here failed "to pursue an easily obtainable piece of evidence that could completely exculpate a suspect." *Wadkins*, 214 F.3d at 541 (citing *Clipper*, 876 F.2d at 20)). Rather, the officers apparently amassed a body of circumstantial evidence against both Spelock and Mead before concluding that the evidence against Mead was more substantial. The evidence tending to point toward Spelock as the responsible party is not so strong as to render their determination unreasonable. *See Gooden*, 954 F.3d at 956 (noting that the proper inquiry is not whether there are genuine disputes of material fact about what occurred during the crime, but whether the officers' reactions to known facts "would strike an objective observer as falling within the range of reasonable judgment").[3]

In sum, Defendants in this case had probable cause to arrest Mead for the murder of Lucy Johnson. Accordingly, they did not violate any of his clearly established rights under the Fourth Amendment and Defendants' Motion for Summary Judgment will be granted as to Plaintiff's malicious prosecution and unlawful seizure claims.

---

[3] Because there was probable cause to arrest Mead, the Court need not consider whether Defendants withheld material exculpatory evidence from the prosecutor's office. However, the Court does note that Plaintiff's argument to this effect depends almost entirely on a fax from the police department summing up the case against him in bullet point form. (Plaintiff's Response in Opposition at 5-6, Doc. No. 161; Plaintiff's Memorandum in Support at 22, Doc. No. 152) Where, as here, the undisputed testimony is that A.D.A. Stetzer was in consistent communication with the police department throughout the investigation, it is unlikely that a single, conclusory fax raises a factual question about evidence suppression. (Stetzer Depo. at 16-17, Doc. No. 141-2)

**b. Substantive and procedural due process**

Plaintiff's next claim is that Defendants violated his substantive and procedural due process rights in violation of the Fourteenth Amendment and *Brady v. Maryland*, 373 U.S. 83 (1963). In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. A plaintiff establishes the elements of a *Brady* violation by showing: (1) the evidence at issue was favorable to him; (2) the evidence at issue was suppressed by the defendants; and (3) the evidence was material, meaning that prejudice to the plaintiff ensued. *Fullwood v. Lee*, 290 F.3d 663, 685 (4th Cir. 2002). "Stated otherwise, *Brady* mandates the disclosure of favorable evidence when it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Watkins v. Rubenstein*, 802 F.3d 637, 642 (4th Cir. 2015) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

Defendants argue that Plaintiff has failed to raise a genuine dispute of material fact as to the third *Brady* requirement. (Defendants' Memorandum in Support at 21-22, Doc. No. 149) They assert that because Plaintiff was not convicted he suffered no prejudice as a result of any suppression of evidence that may have occurred. Plaintiff has declined to address this argument. (*See* Plaintiff's Response in Opposition at 25, Doc. No. 161) It appears to the Court that precedent in this Circuit and in others supports Defendants' argument.

As an initial matter, the Fourth Circuit's explanations of *Brady*'s third prong consistently suggest that a defendant is prejudiced by only by a conviction, not by the mere fact of having to endure a trial. For example, in *Owens v. Baltimore City State's Attorneys Office*, the Fourth Circuit explained that, when analyzing whether a defendant has been prejudiced by a suppression

of evidence, "the question is whether, in the absence of disclosure, the defendant 'received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" 767 F.3d 379, 397 (4th Cir. 2014), *cert. denied sub nom. Baltimore City Police Dep't v. Owens*, 135 S. Ct. 1893 (2015) (quoting *Kyles*, 514 U.S. at 434). For this reason, "[p]rejudice ensues if 'there is a reasonable probability' that the jury would have reached a different result had the evidence been properly disclosed." *Id.* (quoting *United States v. Badley*, 473 U.S. 667, 682 (1985)). Similarly, in *United States v. Parker*, the Fourth Circuit described the third element of a *Brady* violation in the following terms: "Evidence is material if there is a 'reasonable probability that it would have produced a different result'. . . . [t]he 'reasonable probability' standard is satisfied if 'the likelihood of a different result is great enough to undermine confidence in the outcome of the trial.'" 790 F.3d 550, 558 (4th Cir. 2015) (quoting *United States v. Bartko*, 728 F.3d 327, 340 (4th Cir. 2013)).

Thus, it appears from the Fourth Circuit's frequent explications of the *Brady* standard that the prejudice prong is only established if the Defendant can show that the verdict in his case is not entitled to reasonable confidence. It follows that where, as here, the jury acquits, that element of a *Brady* claim is not met. *See Mosley v. City of Chicago*, 614 F.3d 391, 397 (7th Cir. 2010) (acknowledging "the logical tension inherent in claiming a Brady violation occurred when the predicate trial resulted in an acquittal," because "exculpatory evidence coming to light after the trial would reaffirm, not undermine, the confidence in a not guilty verdict"). Moreover, Plaintiff has failed to direct the Court to any caselaw suggesting that the mere fact of having to endure a trial is sufficient to establish prejudice.

In addition, the Court is unaware of any Court of Appeals decision holding that a plaintiff was prejudiced by the suppression of evidence when the plaintiff's trial resulted in an acquittal.

To the contrary, courts that have decided the issue appear to uniformly hold that such claims are not cognizable. *See, e.g.*, *Livers v. Schenck*, 700 F.3d 340, 359 (8th Cir. 2012) ("Assuming appellants failed to disclose exculpatory evidence, there was no *Brady* violation because [appellees] were not convicted."); *Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999) ("The only judgment the court entered was a judgment of acquittal. Regardless of any misconduct by government agents before or during trial, a defendant who is acquitted cannot be said to have been deprived of the right to a fair trial."); *Flores v. Satz*, 137 F.3d 1275, 1278 (11th Cir. 1998) ("Plaintiff . . . was never convicted and, therefore, did not suffer the effects of an unfair trial. As such, the facts of this case do not implicate the protections of *Brady*." (footnote omitted)); *McCune v. City of Grand Rapids*, 842 F.2d 903, 907 (6th Cir. 1988) ("Because the underlying criminal proceeding terminated in appellant's favor, he has not been injured by the act of wrongful suppression of exculpatory evidence.").

Because Plaintiff's trial resulted in acquittal, the Court concludes that Plaintiff has failed to make out the elements of a *Brady* claim. Accordingly, Defendants' Motion for Summary Judgment on Count III will be granted.

## B. Governmental Immunity—State Law Claims

Defendants argue that they are entitled to governmental immunity on Mead's two remaining state law claims, trespass by public officers and malicious prosecution. (Defendants' Memorandum in Support at 2, Doc. No. 119) Plaintiff responds that Defendants have raised the issue of governmental immunity too late in the proceedings, and asks the Court to find that Defendants waived governmental immunity by purchasing insurance, or declare that governmental immunity implicates personal jurisdiction and can be waived if not timely raised.

In the alternative, Plaintiff requests that the Court reinstate his state constitutional claims, which were previously dismissed. (Plaintiff's Response in Opposition at 3, Doc. No. 131)

"In North Carolina, governmental immunity serves to protect a municipality, as well as its officers or employees who are sued in their official capacity, from suits arising from torts committed while the officers or employees are performing a governmental function." *Schlossberg v. Goins*, 540 S.E.2d 49, 52 (N.C. Ct. App. 2000). Law enforcement is a governmental function. *Id.*; *Mullins by Mullins v. Friend*, 449 S.E.2d 227, 230 (N.C. Ct. App. 1994) ("A police officer in the performance of his duties is engaged in a governmental function."). Governmental immunity is absolute unless the municipality has waived it. *Schlossburg*, 540 S.E.2d at 52; *see Evans v. Chalmers*, 703 F.3d 636, 656 (4th Cir. 2012) ("Well-established North Carolina law holds that courts may not lightly infer a waiver of immunity.").

A municipality can waive governmental immunity by purchasing insurance. Pursuant to § 153A-435 of the North Carolina General Statutes:

> A county may contract to insure itself and any of its officers, agents, or employees against liability for wrongful death or negligent or intentional damage to person or property or against absolute liability for damage to person or property caused by an act or omission of the county or of any of its officers, agents, or employees when acting within the scope of their authority and the course of their employment. . . .

By purchasing liability insurance pursuant to this subsection, a municipality "waives the county's governmental immunity, to the extent of insurance coverage, for any act or omission occurring in the exercise of a governmental function." *Id.* Stated differently, "[c]ounties only waive immunity to the extent that [they are] indemnified by the insurance contract from liability for the acts alleged." *Wright v. Gaston Cty.*, 698 S.E.2d 83, 87 (N.C. Ct. App. 2010); *accord. Dawes v. Nash Cty.*, 584 S.E.2d 760, 763 (N.C. Ct. App. 2003); *Combs v. Town of Belhaven*, 415 S.E.2d 91, 92 (N.C. Ct. App. 1992).

As an initial matter, the Court declines Plaintiff's request to determine, as a matter of North Carolina law, that governmental immunity implicates personal jurisdiction and thus may be waived if a defendant fails to timely raise it. The Court acknowledges that reviewing courts have referred to the issue as unsettled under North Carolina law in the past. *See, e.g.*, *Collum v. Charlotte-Mecklenburg Bd. of Educ.*, No. 3:07CV534-RJC-DSC, 2010 WL 702462, at \*6 (W.D.N.C. Feb. 23, 2010); *Frye v. Brunswick Cty. Bd. of Educ.*, 612 F. Supp. 2d 694, 700 (E.D.N.C. 2009). The Court also notes, however, that the Fourth Circuit recently treated the question of whether a North Carolina municipality had waived governmental immunity as one of subject matter jurisdiction. *AGI Assocs., LLC v. City of Hickory*, 773 F.3d 576, 578 (4th Cir. 2014). The Court finds that in light of the Fourth Circuit's precedent, it must treat Defendants' Motion as raising a question of subject matter jurisdiction and conclude that the failure to assert the argument in its motion for judgment on the pleadings did not waive the defense. Indeed, it is well settled that parties cannot waive or consent to subject matter jurisdiction, and in the absence of objection, courts must raise the issue *sua sponte*. *See State v. Ivory*, 906 F.2d 999, 1001 n.2 (4th Cir. 1990).

Because it appears that Defendants have not waived the defense of governmental immunity by failing to raise it at an earlier stage of the proceedings, the Court must determine whether the County's purchase of liability insurance waived its immunity. As Defendants point out, the North Carolina Court of Appeals previously ruled in *Wright v. Gaston County* that the following language, contained in the County's 2006 insurance policy, did *not* waive its governmental immunity:

> [b]y accepting coverage under this policy, neither the insured nor [insurer] waive any of the insured's statutory or common law immunities and limits of liability and/or monetary damages (including what are commonly referred to as liability

damages caps), and [insurer] shall not be liable for any claim or damages in excess
of such immunities or limits . . . .

*Wright*, 698 S.E.2d at 606-08.  The Court of Appeals explained that the provision at issue was

clear and unambiguous in its expressed intent not to waive immunity, and as a result, the court

was precluded by binding North Carolina precedent from finding waiver.  *Id.* at 608 (citing

*Estate of Earley v. Haywood Cty. Dep't of Soc. Servs.*, 694 S.E.2d 405 (N.C. Ct. App. 2010);

*Patrick v. Wake Cty. Dep't of Human Servs.*, 1655 S.E.2d 920 (N.C. Ct. App. 2008)).

The relevant language in Gaston County's insurance policy has changed since the North

Carolina Court of Appeals considered it.  Nevertheless, the new language is "materially

indistinguishable" from the language in *Wright* and other North Carolina precedents.  *See id.*

Between 2010 and 2011, the County's policy stated "[t]his insurance applies to the tort liability

of any insured only to the extent that such tort liability is not subject to any defense of

governmental immunity under North Carolina law," and further clarified that the County's

"purchase of this policy is not a waiver, under North Carolina General Statute Section 160A-485

. . . of any governmental immunity that would be available to any insured had you not purchased

the policy."  (Memorandum in Support at 4, Doc. No. 119)  Similarly, the County's Policy

between 2011 and 2012 included the following provision:  "[f]or any amount for which the

Insured would not be liable under existing governmental or sovereign immunity but for the

existence of this Policy; the issuance of this insurance shall not be deemed a waiver of any

statutory immunities by or on behalf of any insured . . . ."  (Memorandum in Support at 4, Doc.

No. 119)  It further stated that the insurer "expressly reserve[d] any and all rights to deny liability

by reason of such immunity, and to assert the limitations as to the amount of liability as might be

provided by law."  (Id.)

Each of these operative provisions expressly and unambiguously stated that the policies did not waive governmental immunity and that their coverage only extended to claims for which governmental immunity would not apply. In this regard, they are indistinguishable from other insurance policies that North Carolina courts have found preserved immunity. Accordingly, purchase of the policies did not effect waiver under § 153A-435. *See id.* ("Purchase of insurance pursuant to this subsection waives the county's governmental immunity, *to the extent of insurance coverage . . . .*" (emphasis added)); *see also Evans*, 704 F.3d at 656 (finding no waiver of governmental immunity where the policy "is clear and none of the plaintiffs' arguments undermine its clarity"). Because it appears that Defendants have not waived governmental immunity, Plaintiff cannot proceed on his state law tort claims and Defendants' Motion for Summary Judgment will be granted.[4]

The remaining question, then, is whether the Court should reinstate Plaintiff's claims under the North Carolina Constitution, which the Court dismissed on November 1, 2013 on the grounds that Plaintiff had adequate remedies at state law. (Order on Motion for Judgment on the Pleadings at 16-17, Doc. No. 90) As Defendants point out, this argument should have been raised in a separate motion pursuant to Local Rule 7.1(c)(2). Nevertheless, the Court will address it.

This Court previously ruled that Plaintiff's constitutional claims should be dismissed because adequate alternative remedies were available to him. (Order on Motion for Judgment on the Pleadings at 16-17, Doc. No. 90) At that time, Defendants had not asserted that they were entitled to governmental immunity. (Memorandum in Support at 20 n.7, Doc. No. 76) Although

---

[4] The parties also dispute whether public officer immunity—a North Carolina immunity doctrine that uses the same framework of analysis as qualified immunity—bars Mead from recovering on his state law claims. (*See* Defendants' Memorandum in Support at 24-25, Doc. No. 149) Because governmental immunity bars Plaintiff from asserting his state law claims, the Court need not address these arguments.

as the Court has explained, Defendants could not have waived their defense of governmental immunity, their decision to raise it at a later date is problematic because, under North Carolina law, state tort claims do not constitute adequate alternative remedies when they are completely precluded by the doctrine of governmental immunity. *Craig ex rel. Craig v. New Hanover Cty. Bd. of Educ.*, 678 S.E.2d 351, 356-57 (N.C. 2009).

Nevertheless, the Court will deny Plaintiff's request to reinstate his state constitutional claims because to do so would be futile. Neither claim can succeed as a matter of law. Plaintiff alleged a claim for false arrest and false imprisonment, under Article I, §§ 19, 20 of the North Carolina Constitution. But this claim must fail because it is undisputed that Plaintiff was arrested and held pursuant to an arrest warrant signed by a neutral magistrate. *Turner v. Thomas*, 762 S.E.2d 252, 266 (N.C. Ct. App. 2014) *review allowed, writ allowed*, 767 S.E.2d 523 (N.C. 2015) ("[A] false imprisonment ends once the victim becomes held pursuant to such process— when, for example, he is bound over by a magistrate or arraigned on charges."). Plaintiff's substantive due process claim is similarly insufficient. North Carolina courts interpret substantive due process under their state constitution to be the same as the federal substantive due process doctrine. *State v. Bryant*, 359 N.C. 554, 563, 614 S.E.2d 479, 485 (N.C. 2005) ("N.C. Const. art. I, § 19, 'is synonymous with due process of law as found in the Fourteenth Amendment to the Federal Constitution.'" (citation omitted)). Thus, for the reasons set out in the preceding section, Plaintiff could not state a state constitutional due process claim based on any alleged suppression of evidence. And under federal law, there is "no substantive due process right against prosecution on less than probable cause." *Taylor v. Waters*, 81 F.3d 429, 436 (4th Cir. 1996). Accordingly, even if Plaintiff's arrest was not supported by probable cause—and as the Court has explained, it was—Plaintiff would still be unable to state a substantive due process

claim under the North Carolina constitution on this ground. For these reasons, the Court will not reinstate Plaintiff's previously dismissed claims.

## IV. CONCLUSION

The Court finds that Defendants are entitled to qualified immunity on Plaintiff's federal claims under 42 U.S.C. § 1983. As for Plaintiff's state law claims, the Court concludes that Defendants are entitled to governmental immunity. Finally, the parties recently filed a Joint Motion for Extension of Time (Doc. No. 176), requesting that the Court move the date set for trial. Because the Court finds that Summary Judgment is warranted, this Motion is denied as moot.

## ORDER

**IT IS, THEREFORE, ORDERED** that

    (1) Defendants' Partial Motion to Dismiss (Doc. No. 117) be **GRANTED**;

    (2) Defendants' Motion for Summary Judgment (Doc. No. 141) be **GRANTED**;

    (3) Plaintiff's Motion for Partial Summary Judgment on Counts II and IV (Doc. No. 150) be **DENIED**; and

    (4) The parties' Joint Motion for Extension of Time (Doc. No. 176) be **DENIED AS MOOT.**

The Clerk of Court is directed to close this civil case.

    **SO ORDERED.**

Signed: January 25, 2016

Graham C. Mullen
United States District Judge

25